## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CELENA PARKER, as Personal
Representative for the ESTATE
OF DAMITA K. PARKER, deceased,

     Plaintiff,

Case No. 20-12475

v .

Hon. Denise Page Hood

WILLIAM BEAUMONT HOSPITAL
d/b/a BEAUMONT HOSPITAL, ROYAL
OAK, BEAUMONT HEALTH d/b/a
ROYAL OAK HOSPITAL, severally.

     Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF No. 44] and DENYING PLAINTIFF'S MOTION TO STRIKE WITNESSES [ECF No. 43]

## I.    INTRODUCTION

This case was filed on September 9, 2020, on behalf of Damita Parker

("Damita"), who is deceased. Celena Parker ("Celena") is Damita's daughter and

the personal representative of Damita's estate. The Amended Complaint alleges

that Beaumont violated: (a) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794,

("Rehab Act") (Count I); (b) Section 1557 of the Patient Protection and Affordable

Care Act ("PPACA") (Count II); (c) Title III of the Americans with Disabilities

Act, 42 U.S.C. § 12181 *et seq.*, ("ADA") (Count III); and (d) Michigan's Persons with Disabilities Civil Rights Act, MCL § 37.1101 *et seq.* ("PWDCRA") (Count IV); by failing to provide Damita, who was deaf, with an American Sign Language interpreter – or any other auxiliary aid(s) -- during her visit in November 2016 (hereinafter, the claims alleged at Counts I-IV are collectively referred to as the "disability civil rights claims").

The Amended Complaint further alleges that: (1) Defendants' physicians and physician assistants were medically negligent in providing care to Damita during her November 2016 visit (Counts V and VI); and (2) Defendants were vicariously liable for all of the disability civil rights violations and medical negligence (Counts VII-X) (hereinafter, the claims alleged at Counts V-X are collectively referred to as the "state law claims").

Presently before the Court are Defendants' Motion for Summary Judgment with respect to the disability civil rights claims, ECF No. 44, and Plaintiff's Motion to Strike Witnesses, ECF No. 43.  The motions have been briefed, and a hearing on the motions was held.  The Motion for Summary Judgment is granted as to the ADA claim and otherwise denied, and the Motion to Strike Witnesses is denied.

## II.    BACKGROUND

Damita had congenital hearing loss, and by the age of eight years-old, she had been diagnosed as deaf. ECF No. 47, Ex. 1 at 1.  Hearing loss is characterized as mild, moderate, severe, or profound. *Id.* at Ex. 2.  Damita's hearing loss was among the most significant, as she was profoundly deaf. *Id.* at Ex. 1 at 2. Her profound deafness severely impaired her ability to communicate, and Damita primarily communicated with others by utilizing American Sign Language ("ASL"). *Id.* at Ex. 2; Ex. 3 at 32.  ASL is its own language, separate and distinct from English, and one relies on hand and face movements and body language to communicate through its own unique rules for word pronunciation, formation, and word order. *Id*. at Ex. 3 at 32; Ex. 4 at 24.  Damita utilized texting and videoconferencing to communicate with ASL daily. *Id*. at Ex. 3 at 28.  Celena also has 50% hearing loss in both ears, and she generally communicates verbally and by lip reading, though she also used to be proficient at ASL.

On November 3, 2016, Damita began experiencing chest pain, shortness of breath, and weakness. *Id.* at Ex. 3 at 37-38.  Celena drove her to the Beaumont Royal Oak Emergency Department at 10:32 p.m. Almost immediately upon arrival, Celena had to assist with communications between Damita and the triage nurse. *Id*. at 39-40.  Celena requested an ASL interpreter because of communication barriers presented by the Parkers' deafness. *Id*. at 56.  Celena was informed that an

interpreter would be contacted. *Id*. at 57-58.  When Celena asked for an update on the status of an ASL interpreter, she was told there would be an hour to an hour-and-a-half wait. *Id*. at 57-58.  Subsequently, a nurse informed Celena that the hospital could not secure an interpreter. *Id*.  No other auxiliary aid was offered or provided.

Celena reported that her mother had chest pain, shortness of breath, and weakness, *id*. at 52, but the complaint of chest pain was never documented. Damita's vital signs were taken, and her pulse was 124. ECF No. 47, Ex. 5 at 11. Damita's records reflect that at 10:49 p.m., she was "hemodynamically stable." *Id*. at 23. The only symptom recorded by the triage nurse was "abdominal pain." *Id*. at 16. Damita was admitted to the Emergency Department under the care of emergency medicine physician, Dr. Almquist.

Celena told Dr. Almquist that her mother was experiencing weakness, shortness of breath, pain in her legs, and difficulty walking. *Id.* at Ex. 3 at 69. She also informed him that she had previously requested an ASL interpreter, but one had not been provided. *Id*. at 74.  Dr. Almquist recorded Damita's symptoms as intermittent right and left upper quadrant pain and epigastric pain, with no pertinent history, and no prior history of abdominal pain. *Id*.; Ex. 5 at 18-19.  He also documented that Damita had decreased hearing in both ears. *Id.* at Ex. 5 at 20.

At 12:50 a.m. on November 4, 2016, Damita had an EKG that produced abnormal results; one of Plaintiff's experts states those results were indicative of a pulmonary embolism ("PE").[1] *Id*. at 78-79; Ex. 6 at 46-47.  At 2:37 a.m., a general surgery consult was obtained in response to an ultrasound suggesting Damita's gallbladder may have been swollen. The consult noted that Damita was "very hard of hearing." *Id.* at Ex. 5 at 28.  Consulting physicians, Drs. Meier and Villalba, relied upon Damita and "[a]vailable medical record" to obtain Damita's history of present illness, which included cough and shortness of breath. *Id*. at 26-28.  The plan at 2:37 a.m. was to admit Damita to the Observation Unit. *Id*. at 30.  On November 4, 2016, at 7:22 a.m., Damita's EKG was interpreted by James Stewart, M.D., who noted that Damita's ventricular rate had increased by 47 beats per minute compared to her previous EKG from March 2016. *Id*. at 38-39. Damita's heart rate remained elevated for nearly the duration of her stay. *Id*. at 11.

At 7:15 p.m. on November 4, 2016, Damita was discharged with a diagnosis of epigastric abdominal pain. *Id*. at 69.  Damita remained tachycardic on discharge. *Id*. at 11.  Her history of deep venous thrombosis ("DVT") and symptoms of chest and leg pain were not obtained during her stay. *See* ECF No. 47, Ex. 7 at 382, 395-400.  The Parkers left the hospital with the understanding that the plan of care for Damita was to surgically remove her gallbladder. *Id.* at Ex. 3 at 80, 106-07.  On

---

[1] "Pulmonary embolism (PE) occurs when a blood clot (thrombus) dislodges from a vein, travels through the bloodstream, and lodges in the lungs (where it is called a "pulmonary embolus"). Most blood clots originally form in one of the deep veins of the legs, thighs, or pelvis; this condition is known as deep vein thrombosis (DVT)." ECF No. 47, Ex. 13.

November 6, 2016, Damita died of a pulmonary embolism from a DVT in her right

leg. *Id.* at Ex. 8 at 42-43.  The pulmonary embolism had been present for more than

72 hours. *Id*. at 22-24, 29, 37-38.

### III.   LEGAL STANDARDS

#### A. Summary Judgment

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall

grant summary judgment if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).   The presence of factual disputes will preclude granting of

summary judgment only if the disputes are genuine and concern material facts.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a

material fact is "genuine" only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Id*.  Although the Court must view the

motion in the light most favorable to the nonmoving party, where "the moving

party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).   Summary

judgment must be entered against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

**B.** Disability Civil Rights Laws

The ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations" in places of public accommodation. 42 U.S.C. §12182(a); 28 C.F.R. §36.201(a). Section 504 of the Rehabilitation Act provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794. The ADA and Rehab Act are similar in substance, and "cases interpreting either are applicable and interchangeable." *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir. 1998). The burden then shifts to the defendant to prove that the plaintiff was not denied medical treatment, or that the denial was not based solely upon the plaintiff's disability. *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1166 (E.D. Mich. 1994).

7

To state a claim under the Rehab Act, as incorporated into the PPACA, a plaintiff must show that: (1) she is an individual with a disability; (2) she is otherwise qualified for participation in a health program or activity; (3) she is being excluded from participation in, denied the benefits of, or subjected to discrimination under the program solely by reason of her disability; and (4) the program receives federal assistance. *See, e.g., Maddox v. Univ. of Tenn.*, 62 F.3d 843, 846 (6th Cir. 1995), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012); *Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 241 (6th Cir. 2019); *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1998).

To establish claims under the ADA and the PWDCRA, a plaintiff must show that: (1) she had substantial limitations to major life activities and was an individual with a disability within the meaning of the ADA or PWDCRA; and (2) she was discriminated against on the basis of her disability in the full and equal enjoyment of the goods, services, privileges, advantages, or accommodations of a place of public accommodation by a person who owns, leases, or operates a place of public accommodation. *See* 42 U.S.C. § 12102(2); 42 U.S.C. § 12182(a); MCL § 37.1103; MCL § 37.1303(a).

The PWDCRA prohibits discrimination on the basis of one's disability and specifically permits "a civil action for appropriate injunctive relief or damages, or

both." Recovery is permitted for "injury or loss" caused by violation of the statute. There is no restriction, limitation, or qualification placed on the terms "injury or loss." To make a prima facie case of violation of the PWDCRA, a plaintiff must first establish "that the defendant has failed to accommodate his handicap." *Cebreco v. Music Hall Ctr. for the Performing Arts, Inc.*, 219 Mich. App. 353, 360 (1996). The burden then shifts to the defendant to show that such accommodations would impose an "undue hardship," such as "financial expenses, inconvenience to other patrons, safety or fire hazards, and so forth." *Id*. If the defendant can show that accommodating the plaintiff would impose an "undue hardship," the burden would again shift to the plaintiff to establish by a preponderance of the evidence an undue hardship would not result from such accommodation.

Courts routinely analyze claims under the Rehab Act and ADA together. *Mayberry*, 843 F. Supp. at 1164-66.  Likewise, claims under the PWDCRA are analyzed using the same framework as the ADA. *Id*.; *Curry v. Cyprian Ctr.*, 17 F. App'x 339, 341 (6th Cir. 2001) (citation omitted) ("Because '[c]laims of handicap discrimination under Michigan law essentially track those under federal law[,] ... resolution of [Plaintiff's] claim under the federal statute also dispenses with [her] claim under the [PWDCRA].'"); *Coryell v. Hurley Med. Ctr.*, No. 340163, 2018 WL 4658933, at **2-4 (Mich. Ct. App. Sept. 27, 2018).

If a plaintiff successfully establishes a prima facie case of disability discrimination under these statutes, the burden shifts to defendant to show the plaintiff was not denied effective medical treatment or defendant's denial was not based solely upon plaintiff's disability. *Burley v. Quiroga*, No. 16-CV10712, 2019 WL 4316499, at **4-5 (E.D. Mich. June 6, 2019), report and recommendation adopted, WL 3334810 (E.D. Mich. July 25, 2019). *Mayberry v. Von Valtier*, 843 F. Supp. 1160, 1166 (E.D. Mich. 1994).

Violations of the RA and ADA occur when a hospital "fails to provide 'appropriate auxiliary aids and services' to a deaf patient, or a patient's deaf companion, 'where necessary to ensure effective communication.'" *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017).  In *Silva*, the court held that plaintiffs presented sufficient evidence to preclude summary judgment where defendant hospitals provided video remote interpreting machines ("VRI") that frequently malfunctioned, relied on family-member companions for interpretive assistance, and utilized handwritten notes to try to communicate with deaf plaintiffs who primarily used ASL. *Id*. at 829-30. The court concluded that a reasonable jury could find that defendants failed to ensure effective communication. *Id*. at 831. The court explained that effective communication generally requires more than merely communicating primary symptoms, treatment plans, and discharge instructions, but includes more engaged and broad

conversations, and reliance on companions to facilitate communication is not an "appropriate" auxiliary aid and "violates the command of ADA regulations[.]" *Id*. at 835, 839-40. Instances of technological failure, use of written notes to communicate medical terminology, and reliance on a companion to translate all demonstrate impaired informational exchange precluding summary judgment. *Id*. at 837-38.

## I.   MOTION FOR SUMMARY JUDGMENT

In the context of hearing-impaired individuals seeking medical treatment, disability discrimination occurs where a hospital fails to "furnish appropriate auxiliary aids and services where necessary to ensure effective communication …." 28 C.F.R. § 36.303(a) and (c)(1).  The standard for effective communication is "the equal opportunity to participate in obtaining and utilizing services." *Silva v. Baptist Health S. Fla., Inc.*, 838 F. Appx. 376, 379 (11th Cir. 2020).  "The proper inquiry is whether the hospital provided the kind of auxiliary aid necessary to ensure that a deaf patient was not impaired in exchanging medically relevant information with hospital staff." *Id*. The Department of Justice has commented that "[t]he auxiliary aid requirement is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication." *Mayberry*, 843 F. Supp. at 1164 (E.D. Mich. 1994) (emphasis added).

Auxiliary aids can include live interpreters or video remote interpreting systems, among other aids such as computer-aided transcription services and written materials. 28 C.F.R. § 36.303(b). In its commentary on the final regulations implementing the ADA, the Department of Justice noted that "the auxiliary aid requirement is a flexible one." *Mayberry*, 843 F. Supp. at 1164.   A defendant therefore may establish that a hearing-impaired plaintiff was not denied equal medical treatment based on their disability by showing an interpreter was not necessary to ensure effective communication during a medical appointment. *Id*. at 1166; *Burley*, 2019 WL 4316499, at **4-5.

Neither the Rehab Act, PPACA, nor the ADA (including its state law equivalents) establishes a *per se* rule that sign language (ASL) interpreters are necessary in hospital settings. *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 602 (11th Cir. 2015) ("[N]ot every denial of a request for an auxiliary aid precludes summary judgment or creates liability under the ADA or Rehab Act," as construing the regulations pertaining to the disability civil rights statutes to automatically transform a requested service into a "necessary" service merely by the fact that it was requested would "effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid.").

The key question is whether the hospital afforded "a level of communication to a deaf patient about medically relevant information that is substantially equal to

that afforded to non-disabled patients." *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 578-79 (N.D. Ohio 2020), citing 45 C.F.R. § 84.4.  A hospital must furnish appropriate auxiliary aids and services where necessary to "ensure effective communication with individuals with disabilities." *Id*. at 577; *Burley*, 2019 WL 4316499, at *5 (the denial of an interpreter will not violate the ADA or the Rehab Act where the public entity "can demonstrate another effective means of communication exist[ed]."); *Coryell*, 2018 WL 4658933, at **2-3 (under the PWDCRA, "the place of public accommodation chooses the type of auxiliary aid or service, but that choice must result in effective communication."). The type of auxiliary aid or service necessary to ensure "effective communication" will vary in accordance with the method of communication used by the individual, the nature, length, and complexity of the communication involved, and the context in which the communication is taking place. *Tokmenko*, 488 F. Supp. 3d at 578; 28 § C.F.R. 35.160(b)(2).

Damita was profoundly deaf, and Defendants do not challenge that she was an otherwise qualified handicapped person. They argue that no reasonable jury could find that Defendants did not ensure effective communication.

Whether appropriate auxiliary aids were provided to ensure effective communication is an inherently fact intensive inquiry, often precluding summary judgment. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342 (11th Cir.

2012).  The Court finds that premise prescient in this case, where there are several genuine factual disputes regarding: (a) Defendants' failure to give primary consideration to Celena's request for an ASL interpreter for Damita; (b) the effectiveness of the communications between Damita and Celena, on the one hand, and Defendants' employees, on the other hand; and (c) whether Defendants failed to accommodate Damita's deafness.  Summary judgment is denied in its entirety, except with respect to Plaintiff's ADA claim for injunctive relief.

Defendants first argue that relief for inadequate, negligent medical treatment is what Plaintiff seeks in this lawsuit. It is well settled that the Rehab Act, PPACA, ADA, and PWDCRA do not provide general causes of action to challenge the sufficiency of medical treatment. *See, e.g., Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (concluding the ADA would not be violated by a prison's failure to address the medical needs of its disabled prisoners and that the statute "does not create a remedy for medical malpractice"); *Bonds v. S. Health Partners, Inc.*, No. 2:15-CV-209-WOB, 2016 WL 1394528, at **6-7 (E.D. Ky. Apr. 6, 2016).  These statutes also do not provide relief for alleged incompetent medical treatment. *Kensu v. Rapelje*, No. 12-11877, 2015 WL 5302816, at *4 (E.D. Mich. Sept. 10, 2015) (Roberts, J.).

The Court finds that those cases help illustrate the distinction between allegations of inadequate medical treatment and unlawful discrimination. In

*Bryant*, a paraplegic Illinois state prisoner sought damages under the Eighth Amendment and the ADA.  The court concluded that Bryant had not claimed that he was "treated worse because he was disabled" or that he was excluded from any program or service but was complaining of improper treatment for his disabling condition (paraplegia). *Bryant*, 84 F.3d at 249. The court held that the ADA is "not violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" and noted that "no discrimination is alleged." *Id*.

In *Bonds*, the plaintiff, a Kentucky prison inmate, alleged that he was denied proper medication for his diabetes while incarcerated. *Bonds*, 2016 WL 1394528, at *1, *6.  The court found that the plaintiff had not satisfied the third requirement, which requires a plaintiff to allege that he is being excluded from receiving proper medical treatment (for either of his conditions) because of his alleged disabilities, or put another way, that he was discriminated against because of his alleged disabilities. *Id*. at *8. *See also Vick v. Core Civic*, 329 F.Supp.3d 426, 444 (M.D. Tenn., 2018) ("Put another way, the Plaintiff is claiming that he was not properly treated for his diabetes, not that he was mistreated because of his diabetes.").

In *Kensu*, the court refused to recognize a Michigan prisoner's claim under the ADA asserting that the prison failed to provide him with a special diet based on his wheat and dairy intolerance. The court dismissed the plaintiff's ADA claim as one alleging incompetent medical treatment, rather than an assertion that he had

been excluded from a service, program, or activity, or had suffered discrimination because of a disability. *Kensu*, 2015 WL 5302816, at *4.

The Court concludes that the case law relied on by Defendants reflects that the federal disability civil rights statutes require equal access to and equal opportunity to participate in their medical treatment, though they do not require that such treatment be competent. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *Biondo v Kaledia Health*, 935 F.3d 68, 73 (2d Cir. 2019). Plaintiff has alleged – and offered evidence -- that because she was deaf, Defendants discriminated against her by denying her equal access to medical care and treatment. As these are the types of claims covered by the disability civil rights statutes, the Court denies Defendants' motion for summary judgment on those claims.

Defendants argue, and Plaintiff does not respond to Defendants' argument, that Damita's claims under the ADA should be dismissed for lack of standing, as the ADA provides only for injunctive relief. Defendants argue that Damita's estate cannot show she would benefit from any injunction that might be issued since she has passed away. *Proctor v. Prince George's Hospital Center*, 32 F. Supp.2d 820, 827 (D. Md. 1998) (ordering plaintiff to show cause why his claims for injunctive relief under the ADA should not be dismissed where he could not show that he would be returning to the hospital to benefit from any injunction).

Defendants also maintain that no auxiliary aids were necessary in this matter because Celena testified that she and Damita: (a) conveyed all of these alleged symptoms to Dr. Almquist and other medical providers at Beaumont; and (b) asked Dr. Almquist why he was focused on Damita's gallbladder and not her chest pain. ECF No. 44, Ex. 6 at 51-52, 61, 66, 69, 71-72. Defendants insist that Celena's testimony establishes that: (1) Dr. Almquist and the other healthcare providers at Beaumont were fully aware of the symptoms Plaintiff relies upon to show that Damita was allegedly suffering from a pulmonary embolism, but (2) nonetheless treated her for an abdominal issue.  This, Defendants argue, is simply a different way of arguing that Defendants' employees committed medical malpractice.

The Court agrees that there is evidence that Celena testified that she and Damita communicated a number of symptoms to Defendant that Plaintiff believes Defendants' employees should have realized were indicative of DVT and the risk for a PE, including chest pain, leg pain, shortness of breath, etc.   Although Defendants accept as true for purposes of the summary judgment motion that Celena asked for an ASL interpreter shortly after Damita's arrival (and subsequently), Defendants dismiss such request(s) as irrelevant because Damita and Celena were able to effectively communicate Damita's symptoms and medical history.  Defendants ignore, however, the fact that, notwithstanding Celena and Damita communicating symptoms such as chest pain, leg pain, shortness of breath,

etc., there is absence in: (a) Defendants' medical records for Damita regarding what Celena states was communicated; and (b) the testimony of defendants' employees regarding that key information.  Those discrepancies create a genuine dispute of material fact as to whether: (1) Damita and/or Celena were able to effectively communicate to Defendants' employees; and (2) Defendants' employees were able to understand or comprehend what Damita and/or Celena were expressing to them.

Defendants assert that they did not violate Damita's rights under the disability civil rights statutes because Damita and Celena communicated with Defendants' employees. *See Martin*, 621 F. App'x at 601-04 (granting defendant's motion for summary judgment of plaintiff's Rehab Act and ADA claims, despite defendant's failure to provide a requested interpreter, where one plaintiff was able to communicate with hospital staff via her daughter and by writing notes and the hospital utilized detailed written notes and graphics with the other plaintiff who regularly uses writing to communicate); *Francois v. Our Lady of the Lake Found.*, No. CV 17-393-SDD-SDJ, 2020 WL 6066167, at **5-6, **10-16 (M.D. La. Oct. 14, 2020), *aff'd sub nom. Francois v. Our Lady of the Lake Hosp., Inc.*, 8 F.4th 370 (5th Cir. 2021) (granting defendant's motion for summary judgment and dismissing plaintiff's Rehab Act and PPACA claims where defendant hospital effectively obtained plaintiff's medical history via written questions and

interviewing plaintiff's grandmother such that no interpreter was needed to effectively communicate despite grandmother's request for an interpreter upon arrival at the hospital).

The Court finds Defendants' reliance on *Martin* deficient, as *Martin* actually supports the denial of summary judgment in this case. In *Martin*, the court held a hospital's failure to provide an interpreter on demand did not preclude summary judgment or create liability under the ADA or the Rehab Act. *Id.* at 602. To reach this conclusion, however, that court found the hospital effectively communicated with the plaintiffs by: (1) communicating with one of the plaintiffs through written notes and via that plaintiff's daughter, who was not deaf; (2) communicating with a second plaintiff, who could not show that he requested an interpreter, via written instructions at discharge; and (3) employing graphic displays, via detailed written notes, with the third plaintiff and providing that plaintiff with an ASL interpreter for a portion of his stay. *Id.* at 602-03. Although the first and third plaintiffs each alleged that he requested an interpreter, the court affirmed the lower court's decision granting the hospital's motion for summary judgment because each plaintiff was able to effectively communicate with the hospital using the auxiliary aids described above. *Id.*

The Court finds that, unlike in this case, two of the three deaf plaintiffs in *Martin* were provided auxiliary aids, including the use of "simple but detailed

written notes and graphics" and hours of live interpreter services throughout their interactions with defendants' hospital staff. *Id*. at 596-99.  The third plaintiff had been provided interpreter services on approximately 42 past presentations to defendant hospital, and it was determined that an interpreter was not needed for the presentation complained of to treat a "bump on the head." *Id*. at 598-99, 603.

In a light most favorable to Plaintiff, Damita (and Celena) were not provided any auxiliary aid when Damita presented at Beaumont for what constituted complex medical issues.  At a minimum, there is a genuine dispute of material fact regarding that issue.  The Court also finds that there is a genuine dispute of material fact whether, had Defendants furnished an appropriate auxiliary aid (specifically, an ASL interpreter, as requested), Damita would have been able to communicate in a manner that Defendants' employees would have comprehended her symptoms of chest and leg pain and history of DVT.  Damita had been able to communicate as much at previous presentations to the hospital, where she had asked for and utilized an ASL interpreter. ECF No. 47, Ex. 12 at 26-34, 36-37, 59-61; Ex. 7 at 382, 395-400.   It appears that, in this case, Defendants' employees believed or assumed that Damita could understand and comprehend what the employees said and that they understood and comprehended what Damita and Celena were communicating to the employees.

The Court finds that there is a genuine dispute of material fact as to whether Damita needed an ASL interpreter, something that is particularly clear in light of Damita's profound deafness.   Damita's profound deafness was obvious, as evidenced by the fact that it was documented during her admission. ECF No. 47, Ex. 5 at 20, 28; Ex. 2; Ex. 4 at 40).   On that basis alone, the Court could find that there is a genuine dispute of material fact that Defendants failed to ensure effective communication, as required of them under the ADA and RA, by failing to furnish any auxiliary aid. *McCoy v. Texas Dep't of Crim. Just.*, No. C.A.C. 05 370, 2006 WL 2331055, at **7-8 (S.D. Tex. Aug. 9, 2006) (rejecting defendant's argument that it could not be held liable under the ADA and RA because the plaintiff did not request an accommodation and concluding that a jury could find that defendant had a duty to accommodate where they were on notice of plaintiff's alleged disability and obvious need for accommodation); *Cleveland v. Gautreaux*, 198 F. Supp. 3d. 717, 746 (M.D. La. 2016) ("'where the defendant otherwise had knowledge of the individual's disability and needs but took no action,' not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim.").

In this case, there is evidence that Damita and/or Celena requested an ASL interpreter shortly after Damita presented at the hospital.   And, not only is it undisputed that the ASL interpreter was not provided during Damita's entire visit,

there is no indication that Defendants' employees offered Damita and/or Celena pen and paper to try to communicate with written notes or offer any other auxiliary aid.

The Court finds that Defendants' argument fails to recognize that Plaintiff's disability civil rights claims do not assert as their basis that Damita's death resulted from the medically inadequate treatment of her disabling condition (her deafness). In support of the disability civil rights claims, Plaintiff alleges that Defendants discriminated against Damita based on her deafness by failing to accommodate her need for a translator/interpreter, the result of which was denying her equal access to medical care that may have saved her life. Plaintiff's disability civil rights claims stem from alleged discrimination against her in violation of the related statutes; specifically, that she was not given access to services and medical care offered by Defendants to non-disabled persons because Defendants failed to provide her with accommodations necessary to allow essential and effective communication. *See* ECF No. 22, ¶¶ 79-84, 95-99, 107-111, 124-133.

In *Loeffler*, the Second Circuit made this point in the context of a case similar to this one.  There, the defendant hospital failed to provide a sign language interpreter for a patient, Robert Loeffler, and his wife, Josephine, both of whom were deaf, which forced their two minor children (with normal hearing) to interpret for them when Robert was admitted to the hospital for cardiac surgery, after which

he suffered a stroke while in recovery. All four family members brought claims against the defendant hospital seeking injunctive relief under the ADA and New York state law, as well as monetary damages under the Rehab Act, New York's Human Rights Law, and common law negligence theories. The district court granted summary judgment on all claims and the plaintiffs appealed. The Second Circuit reversed.

In holding that the plaintiffs' claims under the Rehab Act could proceed to trial, the Second Circuit explained that the plaintiffs' claim was not one of inadequate treatment, but one of discrimination based on denial of equal and meaningful access to medical services.  Again, although the Rehab Act  does not ensure equal medical treatment, it does require equal access to and equal participation in a patient's own treatment. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (the Rehab Act requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers"); *Naiman v. N.Y. Univ.*,  1997 WL 249970, at *2 (S.D.N.Y. May 13, 1997) ("[Plaintiff]'s claims relate to his exclusion from participation in his medical treatment, not the treatment itself.").

The Court finds that Defendants incorrectly characterize Plaintiff's allegations under the Rehab Act, PPACA, ADA, and PWDCRA as claims challenging the sufficiency of medical treatment. Plaintiff separately has alleged a

state law medical malpractice claim based on violations of applicable standards of care, but her claims under the disability civil rights statutes are separate and distinct.   The disability civil rights claims rest on the fact that Damita was discriminated against based on her deafness when Defendants failed and refused to provide her with as ASL interpreter. Based on this alleged discrimination, Plaintiff has established a genuine dispute of material fact as to whether Damita was denied equal and meaningful access to medical care and treatment; specifically, the ability and opportunity to communicate critical medical history and symptoms.

Defendants argue that the evidence demonstrates that the failure to provide Damita with any auxiliary aid(s) did not prevent Damita or Celena from communicating her symptoms of chest and leg pain and her history of DVT. Defendants note that Celena testified unequivocally that she and Damita reported to multiple individuals that Damita "was weak and she was having shortness of breath, and she had pain in her legs and was having trouble walking. And the chest pain." And, it is clear from Celena's testimony that Damita was able to communicate that she was experiencing chest and leg pain. Defendants suggest that an ASL interpreter, MARTTI device, or other auxiliary aid was not needed to impart this information.

Defendants contend that, with regard to the DVT, there is not a single admissible fact that the use of an auxiliary aid would have resulted in Damita

communicating her history of a DVT or that Defendants' medical personnel would have discovered this information. They argue that there is no testimony from any witness, including Celena, that Damita attempted to communicate her history of DVT, but was unable to do so.  Defendants assert that no witness reported that Defendants' medical personnel asked Damita if she had a history of DVT, as this topic simply was not raised by anyone.  They maintain that Damita's argument that an ASL interpreter or other auxiliary aid would have elicited information regarding her history of a DVT is pure speculation.

Defendants fail to acknowledge, however, that although Plaintiff claimed to have communicated this information, there is no evidence in the record that Defendants' employees recorded it.  That distinction constitutes evidence from which a factfinder could determine that Defendants did not understand what Damita and/or Celena were communicating to them, such that they did not record it, because Defendants failed to provide an ASL interpreter, or any other auxiliary aid, including providing a pen and paper to Damita or Celena.

The cases Defendants rely upon differ factually from the instant matter.  In those cases, someone associated with the plaintiff, who does not appear to also be hearing impaired, was indisputably able to communicate with the defendants, without any need for an ASL interpreter, and auxiliary aids were utilized in both

instances. Defendants did not offer or utilize any auxiliary aids in attempting to communicate with Damita and/or Celena.

Unlike defendants in *Silva*, who attempted to provide VRI services and utilize written notes, there is evidence that Defendants' medical personnel did not provide any accommodation and utilized Celena to translate, in violation of the ADA, Rehab Act, and ACA, even though faced with Damita's complex medical problem and profound deafness, as well as Celena's own impaired hearing. Damita had a known and obvious hearing deficit. ECF No. 47, Ex. 2; Ex. 5 at 20, 28; Ex. 12 at 20-22, 57. ASL translator Lisa Vosburg, who provided translation services for Damita on several occasions at medical appointments and legal proceedings, described Damita as "deaf," and testified that without an interpreter effective communication with Damita could not happen. ECF No. 47, Ex. 4 at 40. Emergency medicine physician, Dr. Galan, similarly testified that Damita had a complex medical presentation and required an interpreter or MARTTI device to understand the questions asked, accurately report and describe her symptoms and medical history, and understand her treatment options and plan of care. ECF No. 47, Ex. 12 at 20-24, 26-30, 60-61. Dr. Galan testified that, as a result of the failure to accommodate Damita's deafness, only minimal medical information was obtained and Damita was denied the equal opportunity of exploring the

components of her symptoms and medical history, including a history of DVT. *Id.* at 26-29, 33-34, 37.

The Court finds that there is a genuine dispute of material fact whether, as a direct and proximate result of the alleged: (a) impaired communication between medical personnel and Damita; and (b) minimal information exchange regarding Damita's symptoms and medical history, PE was not included in Damita's differential diagnosis or ruled out with proper testing. (Id. at 20-25).

Claims asserted under Section 1557 of the PPACA are generally analyzed in the same manner as Rehab Act and ADA claims, but PPACA implementing regulations differ. *See, e.g., Fantasia v. Montefiore New Rochelle*, No. 19-CV-11054, 2022 WL 294078 (S.D.N.Y. Feb. 1, 2022). The PPACA recognized the importance of prohibiting disability discrimination specifically within a medical setting, ensuring equal access to the benefits of medical care and treatment. *See* 42 U.S.C. §18116(a).  Federal regulations implementing Title III of the ADA provide that "a public accommodation should consult with individuals with disabilities . . . to determine what type of auxiliary aid is needed. . .", but do not otherwise require public accommodations to defer to the individual's request. 28 C.F.R. §36.303(c)(1)(ii).  The PPACA, however, like Title II of the ADA, requires a public entity to give "primary consideration to the requests of individuals with disabilities" when determining which "types of auxiliary aids and services are

necessary. . . ." 28 C.F.R. §35.160(b)(2); *Vega-Ruiz v. Northwell Health*, 992 F.3d 61, 65 (2d Cir. 2021) ("In other words, the ACA extends 'primary consideration' to individuals seeking services at Title III public accommodations."); *Tomei v. Parkwest Med. Ctr.*, 24 F.4th 508, 513 (6th Cir. 2022) ("Under the Rehabilitaiton Act, public accommodations . . . must ask individuals with disabilities about their choice of aid. . . . [T]he ACA holds all covered health programs . . . must defer to the individual's request.").  The PPACA also provides that "[i]n order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way to protect the privacy and independence of the individual with a disability." 28 C.F.R. §35.160(b)(2).

"Primary consideration" means that "the individual's choice of auxiliary aid must be honored unless the entity 'can demonstrate that another equally effective means of communication is available or that the aid or service requested would fundamentally alter the nature of the program, service, or activity or would result in undue financial and administrative burdens.'" *Fantasia*, 2022 WL 294078, at *8. Defendants assert that their personnel understand the requirements of its policies reflecting the mandates of the ADA, Rehab Act, and ACA, but there is a genuine dispute of material fact as to whether Defendants' employees violated the requirements of the acts and failed to provide primary consideration, or any

consideration, to Celena's requests to provide Damita an ASL interpreter. *See* ECF No. 44, PageID.1138; Ex. 16.

Defendants did not offer or provide one of their allegedly numerous and available video remote interpretive, MARTTI devices. *Id.* at Ex. 17 at 39, 41-44. Plaintiff argues that Defendants instead impermissibly relied on Celena, who was hearing impaired herself, to translate and convey Damita's pertinent medical symptoms and history, in direct violation of the PPACA and Defendants' policy. *See* ECF No. 44, PageID.1142, 1147, 1148-50, 1156. Defendants counter that they did not solely rely on Celena to act as Damita's interpreter. They state that Celena testified multiple times that both she and Damita communicated with Beaumont medical staff regarding Damita's medical issues and symptoms, including the symptoms relating to the pulmonary embolism and Dr. Almquist's proscribed course of treatment. Defendants also note that Damita's medical record contains no reference to Celena being used as an interpreter or functioning as the primary source of communication.

Plaintiff argues that the lack of accommodation and concern for complying with the mandates of the federal disability civil rights statutes is consistent with Beaumont's general practice at that time. Plaintiffs submit that, during the 2016 calendar year, Beaumont had 130,623 patient presentations at their Royal Oak Emergency Department, ECF No. 47, Ex. 19, during which time, MARTTI devices

were used just three times at Royal Oak Emergency Department. *Id*. at Ex. 20. Plaintiff states that Defendants' failure to accommodate Damita was just another instance of their systemic failure to adhere to the mandates of the ADA, ACA, and Rehab Act, which resulted in an investigation by the United States Department of Justice ("DOJ"). That investigation ended when Beaumont entered a Voluntary Resolution Agreement with the DOJ. ECF No. 47, Ex. 18. Plaintiff also argues that Damita required an auxiliary aid to provide ASL translation services to understand medical personnel and accurately describe her symptoms and complete medical history and has hired experts to support that argument. ECF No. 47, Ex. 2; Ex. 4; Ex. 12.  The Court finds this evidence relevant.

The Court finds that Plaintiff has made a prima facie showing of violation of the PWDCRA to preclude summary judgment, including that Defendants would not have suffered an undue hardship providing an appropriate auxiliary aid to Damita.

**II.**   MOTION TO STRIKE WITNESSES

Plaintiff seeks to have the Court strike three expert witnesses from Defendant's most recent witness list, the Amended Witness List filed on May 18, 2022, which was nine (9) days prior to the close of expert discovery.  One of the new listed experts is an emergency room physician (William Berk, M.D.), and two of the new listed experts are physician assistants (Patrick Dougherty, P.A. and

Patrick Smith, P.A.).  Plaintiff argues that, on August 25, 2021, the parties had stipulated to conduct Michigan-style discovery only depositions in lieu of producing expert reports, so amending the witness list to add three new experts only 9 days prior to the close of expert discovery should be disallowed.

When Defendants filed their original witness list on February 26, 2021, they identified one expert pulmonologist and one expert emergency medicine physician. Plaintiff does not object to a second expert emergency medicine physician added by Defendants (Stanley Materka, M.D.), as Plaintiff was able to depose Dr. Materka prior to the close of expert discovery.  Plaintiff represents that it was willing to allow Defendants to extend expert discovery by 30 days to accommodate Defendants' three new proposed experts in exchange for the extension of factual discovery by 30 days (this relates to Plaintiff's pending motion to reopen discovery, argued before the Court on June 14, 2022—recommendation was to deny that motion because the discovery sought was "untimely, redundant and duplicative" (seeking a third Rule 30(b)(6) deposition)).

Plaintiff argues that Defendants should not be able to argue that the factual discovery period should not be extended (and have the Court enforce discovery periods) and then turn around and argue that the expert discovery period should not be extended (and have the Court not enforce discovery periods).  Plaintiff contends that she will be substantially prejudiced by Defendants naming numerous experts

on the eve of the close of the expert discovery period – by not being able to depose them or retain rebuttal witnesses, as well as having to incur significant and unnecessary expenses -- and the experts will have marginal, if any, value.

Defendants argue that they timely disclosed all expert witnesses prior to the expert discovery cut-off date. Although technically true, this is disingenuous in that Plaintiff could not possibly depose three experts in the nine days remaining in the expert discovery period.

Defendant maintains that the Court has discretion to limit the number of expert witnesses, but that "limiting experts because of mere numbers, without reference to the relevancy of their testimony is an abuse of discretion." *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 865 F.2d 761, 769 (6th Cir.), *opinion amended on denial of reh'g sub nom. on other grounds Coal Res., Inc., No. 11 v. Gulf & W. Indus., Inc.*, 877 F.2d 5 (6th Cir. 1989). So, "generally, there is nothing wrong with adducing testimony from multiple experts on related (or even the same) topics . . ." *In re Welding Fume Prod. Liab. Litig.*, No. 1:03-CV-17000, 2010 WL 7699456, at *80 (N.D. Ohio June 4, 2010); *see also Pridemore-Turner v. Univ. Health Sys., Inc.*, 2021 WL 6333361, at *2 (E.D. Tenn. Oct. 13, 2021) (holding defendants are entitled to designate three experts to testify on the issue of standard of care in a healthcare liability action to the extent each expert's testimony is not duplicative where the reasons for each expert's conclusions and opinions are not

identical). Defendants also note that, in Michigan courts, the rules specifically allow a party to name up to three expert witnesses as to the same issue in any given case. Citing MCL 600.2164 ("No more than 3 experts shall be allowed to testify on either side as to the same issue in any given case, unless the court trying such case, in its discretion, permits an additional number of witnesses to testify as experts.").

Defendants state that, in total, they have identified two emergency medicine physician experts (Dr. Materka and Dr. Berk) to testify regarding the standard of care applicable to Defendants' physicians and two emergency medicine physician assistant experts (Patrick Smith and Patrick Dougherty) to testify regarding the standard of care applicable to Defendants' physician assistants. Defendants assert that Plaintiff has not demonstrated substantial prejudice. Defendants argue that the listed witnesses could not have been a surprise to Plaintiff, as their names had been disclosed in emails between counsel and in an affidavit filed by Patrick Dougherty. Defendants represent that Plaintiff can cure any tardiness or surprise by deposing the subject witnesses, and they have advised Plaintiff numerous times that Defendants would produce their expert witnesses after the discovery cut-off. Defendants contend that this evidence will not disrupt trial, as trial will commence on October 11, 2022, at the earliest, which was more than four months after the Amended Witness List was filed and the expert discovery deadline of May 27, 2022 passed, plus a summary judgment motion is pending. Defendants insist that

the testimony of the subject witnesses is critical to understanding "from an objective lens" what the standard of care is.  Finally, Defendants suggest that they were acting in good-faith, consistent with the parties' understanding regarding the identification of expert witnesses, when they filed their Amended Witness List naming Dr. Berk, Patrick Dougherty, and Patrick Smith.

The Court denies Plaintiff's Motion to Strike Witnesses.  Although Defendants' relatively late identification of the three proposed expert witnesses at issue was not entirely reasonable, Plaintiff has had – and still has – the opportunity to depose the witnesses.  Plaintiff has not demonstrated (or given substantial argument) that the proposed expert witness testimony would not be relevant, duplicative, or otherwise unnecessary, such that she would be unfairly prejudiced or would unnecessarily waste Plaintiff or Court resources.

## III.    CONCLUSION

Accordingly, and for the reasons stated above, Defendants' Motion for Summary Judgment [ECF No. 44] is GRANTED IN PART and DENIED IN PART.  The Court dismisses Plaintiff's ADA claim to the extent injunctive relief is sought (Count III), and the Court retains the rest of Plaintiff's claims.

IT IS FURTHER ORDERED that Plaintiff's Motion to Strike Witnesses [ECF No. 43] is DENIED, but Plaintiff shall be afforded the opportunity to depose the three expert witnesses at issue within 45 days of this Order.

May 23, 2023

s/Denise Page Hood
DENISE PAGE HOOD
UNITED STATES DISTRICT COURT